Good morning, Your Honors. My name is Chris Chauvin. I represent the appellant's hometown, which in the underlying case is also the lender and the plaintiff. And the merits issues in this appeal, Your Honor, are pretty narrow. It's an interlocutory appeal, Your Honors, of the plaintiff's claim under the Texas Uniform Fraudulent Transfer Act, TUFTA as it's referred to by the litigants. The merits issue, as I said, is very narrow, and the district court dismissed that claim on very narrow grounds. On this appeal, the defendants also challenged the court's subject matter jurisdiction. And of course, because that issue decides whether this court may decide that the merits issue, I expect that the court would like for me to address subject matter jurisdiction first. So I will do that, unless the court would like for me to just jump straight to the merits. But the subject matter jurisdiction issue, Your Honor, this case was brought in the district court on the basis of diversity jurisdiction, all the claims are state law claims. And the defendant's challenge is to the citizenship of the plaintiff's hometown. Your Honors, there is no challenge to the citizenship of the defendants. There are three public company defendants. There are three companies that are not public companies, and there are several individuals. And there's no dispute on this Nevada and Texas. The question is, what's the citizenship of the plaintiff's hometown? Hometown, Your Honors, is an LLC. And so under the analysis of Cardin v. Arcoma that we've all seen throughout our briefing, you unpack the LLC to its ultimate constituents until you get to somebody where you stop. And in this case, we have the company agreement on page 3 of our reply, Your Honors. It's cut and pasted in one of the footnotes, and it's hometown, the appellant, LLC, is a trustee. And that's just a factual matter. It's just stated there very plainly. And that trustee is U.S. Bank National Association, the National Banking Association. And there's no dispute in this appeal that if that's true, if that's correct, that U.S. Bank National Association, which under the Supreme Court's Wachovia Bank decision, is a citizen for purposes of diversity jurisdiction where it sets up its main office pursuant to its articles of organization. And U.S. Bank has done so in the state of Ohio. And so if that factual matter is accurate, as we say it's very plainly stated in the LLC's company organizational documents, which are cut and pasted in our brief, then that analysis is over. And when the trustee is the ultimate constituent, it's the sole member of that LLC, the plaintiff, the sole member of the appellant. We look to Navarro, Navarro Savings versus Lee, which basically says that when you have the trustee as the party you're analyzing for purposes of subject matter jurisdiction, you stop there. And in this case, the trustee is the sole member, and that's just a factual certainty under the company's LLC agreement. Following on Navarro, the day that our reply brief was due, Your Honors, the U.S. Supreme Court issued an opinion in Americold. And that opinion reaffirms Navarro for the principle that when you're looking at the trustee before the court, if the trustee is the party that we're analyzing for purposes of subject matter jurisdiction, then we look to the trustee. If it's the trust that's before the court for purposes of subject matter jurisdiction, then we need to look at the beneficiaries and look at other items. But again, if it is the trustee, and here the trustee is the sole member of the LLC, that is the plaintiff appellant, then we stop at the trustee. And so Americold reaffirms Navarro and does not change the analysis that we stop at the trustee, the sole member of the LLC plaintiff appellant. The analysis is really as straightforward as that, Your Honor, on subject matter jurisdiction. Following on Americold, Judge Nancy Atlas in the Southern District of Texas had a case where she interpreted Americold in the exact same way that it should apply in this case, Your Honors. She had a trustee before her as the plaintiff, and in that instance, the trustee was acting as the party to analyze for purposes of subject matter jurisdiction. Why don't you move to the merits of the case while you do this? Yes, sir. Yes, sir, Your Honor. Absolutely. The merits of the case is the Tufta claim, Your Honors. And the Tufta claim deals with a very narrow thing that the district court did, which is whether the assets that we plead were fraudulently transferred, and they are advisory agreements whereby the guarantor that guaranteed the loan at issue in the underlying case received tens of millions of dollars annually, whether those agreements and the accompanying revenue stream, whether they qualify as assets under Tufta. And if you go to the statute, Tufta Section 24 of the Texas Business and Commerce Code, you see that asset is incredibly plainly and broadly defined. Indeed, it need not even be an asset under the definition of transfer. It can be an asset or an interest in the asset. And the Texas legislature took the term asset and defined it as any property of the debtor. It's very straightforwardly and plainly. And the legislature said, we're going to identify three instances in which it's not going to qualify as property. It's going to be if it's categorically exempt under state law, if it's subject to a lien, or if it's a tenant-in-common scenario, that doesn't qualify under property. But if it's property of a debtor, it's an asset, and your analysis ends there. It's very broad. Yes, sir, Your Honor. Judge Clement has a throat problem this morning, so I'm reading a question she wants to ask you. Under Texas law, don't property rights have to be vested to be considered, quote, assets, unquote, under Tufta? Under the contracts here, Prime wasn't entitled to payment until it performed the consulting. Is that right? Your Honor, I think that the way that asset is defined and the way property is defined to be anything that may be subject of ownership, I don't think that we must, and that's just how property is defined under Tufta, I don't think we must incorporate that vesting into that definition. I think that it's broad and plain enough to where if it's anything that may be subject of ownership, as the statute reads, and we overlay that with the purpose of Tufta, I don't think that's necessary. But Your Honor, I think even if you impose that requirement, the advisory agreements comply because the way that they've been characterized is just factually not the way that they're set up. What the defendants want the court to see is that this is not a vested right. They want the advisory agreements to come across as a pest control agreement. So you have an agreement with your pest control company that every time you call them, they come and you pay them $100 every time they do pest control services. And if you don't call them, they don't get $100. And so that agreement would have no value, according to the defendants, for any third party. And so it couldn't be an asset under Tufta. But the advisory agreements are not set up that way. And the advisory agreements are in the record just for reference at record 3430 to 3475, Your Honors. The compensation in the advisory agreements, tens of millions of dollars, sets up as a base compensation structure. It is a monthly payment based on the percentage of the total assets under management. It is a clockwork payment that comes in. The base compensation, Your Honors, is not based on specific services rendered. It's based on a percentage of the total assets under management. And then there's a second unpacking to that, that you get a percentage of net income above shareholder value. So those are two components of compensation. And that's, it's close to 1% of all the assets under management these public companies have. That would be millions of dollars. It would easily satisfy our debt, which was $2 million when it was made hard. Now it's, of course, in excess of that. As you, as you read this contract, the, the, the, the, who, I can't even think of the name of the party. The, the trustee, the, the acting party here would be entitled to 60 days of, of revenues. Yes, sir. Even if they were being terminated. Yes, sir. And that's absolutely correct. The termination requires 60 day written notice. And so that's, that's two months of that 1% of the entire assets under management. It's, it's, it's the incentive percentage of net revenue above. And also there are, there are service components to it. That's another component of the compensation under these advisory agreements. And that's if, that's if these advisors went out and, and originated any loans or they any of that revenue within that 60 day period would be far in excess of what would be needed to satisfy our debt. And you're absolutely right. Your Honor, that, that, that should have been there. And, and I think that what the defendants would like to say is, but wait a second, we have the ability to terminate these things. We have the ability to, they're not transferable. And so if they're not transferable, they call it an anti-assignment clause. They don't have any market value. And that's what the district court looked at as well. And I think Your Honor, that, that, that ignores the realities of this case. It's not an anti-assignment provision. In reality, it's an anytime assignment provision. Because as we, we set forth in our complaint at paragraphs 30 to 33, and we cite to SEC filings statements to back it up, the public companies and our guarantor are controlled by the exact same executives. So the reality to it is it's an anytime assignment. It's the same president of those companies. It's the same executive vice president. So if you look at the advisory agreements, and you're the guarantor, our guarantor, and you want to assign this contract, what you do is you follow the provision and you, you submit a written request to the public company for assignment. Well, what you'd be doing under the notice provisions there is you'd be submitting it, the addresses are the exact same, the people are the exact same. You'd effectively be submitting it to yourself. Daniel Moos, the president of the guarantor, would be submitting a request to Daniel Moos, the president of the public companies, asking Daniel, asking himself if he could transfer this contract. So in reality, vis-a-vis the market, vis-a-vis third parties, as the defendants would like for you to look at it, this guarantor could assign this contract anytime this guarantor wanted to. But of course the guarantor didn't want to do that. The guarantor, acting with the public companies, wanted to cancel all the contracts, strip themselves of revenue, and then set up a new desk drawer LLC. Same officers, same executives, and it keeps the pool of money within themselves so that it's not subject to our guarantee liability. So it's absolutely assignable, it's absolutely never going to be transferred, and it's going to be renewed like clockwork, with the same individuals performing the same activities for both companies. What's the status of the alter ego? Your Honor, the alter ego claim is still before the district court, and certainly, I'm sure as you can see from our pleadings, we believe it's very strong. Your Honor, I think that the two claims do dovetail each other, but I think the fraudulent transfer components to it provide us with a viable remedy that can work hand in glove with alter ego. And so I think that forcing us, as maybe the district court was looking at this more of an alter ego case than a fraudulent transfer case, I certainly take that from Judge Godby's opinion, I think that both claims should be there, and that you should be able to analyze alter ego, pardon me, fraudulent transfer in the context of the alter ego analysis. Because of course alter ego can sit with an existing claim and provide additional relief. Maybe if they're right in this contention, they're going to have some problems with the alter ego defense. Yes, sir. I think that's absolutely correct. You asked the question of asset and what's there. One of the operating rough gauges is you can't make people work to generate the asset to the prohibition. So yet, that's another way of looking at it. Was it vested? So what you're saying is that while they may be terminable, that during that narrow period of time within which they could terminate, there did have value and the money was due without any further work? Yes, sir. It was effectively a passive way that these advisors, this guarantor, earned income. A percentage of the assets under management. During that 60-day window, as Judge Dennis pointed out, there would have been millions of dollars available, and they colluded effectively together to go ahead and just not exercise that 60-day window, but the collusive cancelling or refuting or waiving of contractual rights should be under the plain and broad reading of Tufta a part of the claim. So if your companies and you come together and you just say, we're not going to exercise our contractual rights, it's our position, Your Honors, that the contractual rights still must be assets that have market value. Just because you collude and you fraudulently, in our opinion, decide to waive those contractual rights. But vis-a-vis third parties, they absolutely do have value. And I think that one extra point, too, is our opponents do not deny that this happened and the intent behind it. Of course, Judge Godbey found the exception that if we comply with our internal intercompany agreements, we must be clear of Tufta. It's a categorical exception that they want this court to draw out. And I would point to one thing, Your Honors. The Texas legislature actually contemplated this scenario. Under section 24.009 subsection F, as in Fred, of the statute, it sets up a defense. And it says, if what you did is within the ordinary course of business, you cannot be liable under Tufta. It's there. The legislature contemplated that if what you're doing is how your business operates, and there's no evidence of fraud, that's a defense. The defendants did not plead this in this case because they can't get there. Do we have any case law putting any flush on that in courts of business limitation? Your Honor, there is Tufta case law on ordinary course of business. And I believe that case law just indicates that if there's any indicia of fraud, if there's any, in other words, you must articulate as an affirmative defense the business purpose behind what you did. And they know they can't do that because their deposition testimony from the recovery under the guarantee has already said they wanted a clean company. They wanted something away from liability. And they know that that's not ordinary course of business. It's fraud. Thank you, Your Honor. Thank you, sir. Mr. Madden. Yes, Your Honor. Good morning. My name is Mitchell Madden, and I represent, probably quicker to say, all of your appellees except Prime Income Asset Management, LLC, and Prime Income Asset Management, LLC. I'd like to address the merits first, although I do think that there is an issue regarding jurisdiction. We did not contend to Judge Godbee, and Judge Godbee did not rule or find that under Texas Tufta, a contract or rights under the contract that is canceled or transferred can never be a fraudulent conveyance. Instead, what we do is we look at circuit cases that are analogous that inform what's the issue in determining whether or not the particular conduct alleged in the cancellation or termination results in the two elements and asset that's been transferred. And those cases say you don't look to the contract, you look to the rights. And, Judge Clement, the first issue is whether or not those rights are vested. And I think that very clearly, no Texas case and no case submitted by the appellants to this court in this proceeding has shown you a case where you can fraudulently convey any part of a personal service contract that is not vested, that you lose on both elements. It's not an asset because it can't be transferred or it wasn't transferred because it's not an asset. But again, I think Judge Godbee ruled as to both issues in this case. Who issued the guarantee? The guarantee in this case was issued by Prime Income Asset Management, LLC. And these are the persons that terminated the contract? Prime Income Asset Management, LLC, was the advisor under the advisory agreements terminated. But again . . . The guarantee was just a complete illusion. No, Your Honor, I don't believe the guarantee was a complete illusion. What are the assets other than this? What are the assets behind the guarantee? The assets behind the guarantee, and again, I think this analogy, that his analysis is more an element of the alter ego claim that Judge Godbee . . . I recognize that, but I still need to know. . . . clearly reserved, at that time was fully disclosed to the lender before the loan was made, the relationships between all the companies, and the asset or value that Prime Income Asset Management, LLC, had. But the answer is, there was nothing behind it. No, the Prime LLC, at the time of the entry of this loan, was a going concern business, had assets and liabilities, and was providing services under the advisory agreements. The question is, we're not talking about what happened to the other assets. The only focus of this petition, under the teachings of 9B, is whether or not some right under these advisory agreements was an asset that was transferred. And Judge Godbee correctly noted at the first instance, anything after the 60 days is not vested, doesn't come close. The question seems to be, what about those 60 days? Well, first, we've got to understand what the advisory agreements really said. And the appellants contend that the advisory agreements, that they contend, that had Prime not shown up for work on that first day of the month that it was canceled, that they still would have been entitled for that month and the next month to the 1% fee without doing anything. That's not what the agreement says. The agreement says, for every month you're actually working and advising, there's a base salary. Next, what Judge Godbee says is, in distinguishing right, he said, so this is not a transfer, because if you go down that road, in every personal service contract, when the party doesn't show up for work, they're transferring the money they would otherwise be entitled to receive back to the employer. Their argument then, Judge, is by Prime not showing up for work or agreeing to cancel within the 60 days, that somehow one of the publics got a fraudulent conveyance. A fraudulent conveyance of what? Next, Judge Godbee said, that even if you get over, answer the question of a fraudulent conveyance of what, it's not transferable or assignable. What he did is, he looked to Jermoo. Jermoo looked back to Glenn, 1941, fraudulent conveyances and preferences, and Glenn said, and it comes out of Jermoo, he said, the same author who says, you can attack a fraudulent conveyance of every asset, tangible and intangible, and I would tell the court, there are circumstances where a cancellation or termination of a contract with vested rights could be a fraudulent conveyance under that rubric, says, but the same author notes that for an asset to be available to creditors, it must be transferable, i.e., it must be something the debtor can give or sell. Prime could not give or sell its rights to that 60 days. It was not something that could be given or sold. Well, during the 60 days, didn't these agents or whoever they were, didn't they have the power or right to deal with investments of Prime and to maybe charge fees? Was that like a stockbroker does? Judge Dennis, that's a very important question. I'm glad you asked it because I almost forgot to note this. The appellants contend that it's the same people. It's one side, one pocket, and the same pocket. That ignores that the public companies operate through an independent board of directors, and for Mr. Moose to act on behalf of the publics, he had to get a separate slate of board of directors to say okay. So he might have been able to talk for Prime or Prime's board or their private ownership, but he had to pass this by on the public's side, a board of directors elected by a publicly traded company. So they are not the same. They may have had the same officers, but these entities did not have the same directors, and the decision was made on the public's side at the director's level. So briefly, two more things. First, Judge Godby didn't get to the issue of transferee, but again, there's under a no pleading to establish that my individual clients, the individual officers or directors, ever received any benefit from the alleged transfer, even from the 60 days. Secondly, the question with respect to the public's benefit begs the same question Judge Higginbotham was talking about earlier. What benefit did they receive by Prime Income Asset Management LLC not showing up for work? The appellant's going to argue, well, they got the benefit they didn't have to pay for the advisory agreements. Well, they also weren't being advised. And finally, jurisdiction. Judge Atlas, in the recent case that appellants cite to you, just got completely wrong and apparently forgot what she wrote in Berry a couple of years earlier, where she had read Judge Clement's opinion back in 1998 in Fagan involving a land trust and just completely walked over and missed the point of Americold. Judge Atlas, and it makes it clear what is wrong with the appellant's argument on jurisdiction. Judge Atlas went back after Americold and said, well, Judge Sotomayor has now said that a trustee and therefore we're all good in this REMIC circumstance. And this is a REMIC case. It's not this case. First of all, the REMIC, the trustee, the bank didn't sue and is not a party. They chose to place this in an LLC, an artificial entity, registered by the way would be a Texas citizen if the Supreme Court had gone that way, but decided, no, we're going to put this in an LLC. And the member is not a trustee, or that's a way to read it, but the operating agreement says, and I quote, Bank of America N.A. as indenture trustee under the indenture dated November 30, 2006. It's a REMIC. So when you go as Carden and I guess Alphonse in this circuit says, you keep digging down, you look for corporations or humans. Why do we say that Americold makes this distinction clear, that you don't even have to look at whether or not under Corfield the bank is nominal, or whether or not it has control, or whether or not you have to look in this case and find that the indenture in paragraph 4.11, unlike the trust agreement in Navarro, gives the note holders, 50% of them, control of everything that the bank does. So in this case, it's not active, there's not control, and under Corfield they're just nominal. Our reading of Americold is simple. Carden marginalized and tried to set Navarro over in an isolated circumstance, and nobody got it. And so you got some of these REMIC cases, and these Corfield-Lloyd cases. What Judge Sotomayor was saying is, Navarro is limited to a traditional trust where the trustee is a human. Everything else is an artificial entity. Everything else is Carden. That's what we have here. Now, Judge Clement was right, she presaged this in 1998, the district judge in the Southern District of Florida in JPMCC was right when she said, in cases where you choose to park this in an LLC, an artificial entity, and there's no doubt that no trustee or the bank is not a party to this litigation, and you look to the second level, you look to the true nature. You note that the bank is only a nominal party, and that the real member is a REMIC, an artificial entity, and you look to everybody. In this case, the appellant hasn't shown you who all those notables are. So, by not having disclosed that for the record, under Alphonse and Carden, this court lacks jurisdiction. If there are no questions, I'll cede the rest of my time to Mr. Cunningham. Mr. Cunningham. May it please the Court, my name is Jonathan Cunningham, with the firm of Shermoon & Norman, and I represent what's been termed the prime entities, and that is Prime LLC, the Judgment Debtor, and its parent, Prime Inc. I first want to say, I have limited time, because our interests with the non-prime entities for the publics and the individuals, we recognize our interests are directly aligned, there are no real diversions with that, and so we, of course, adopt or follow right along, and I just want to have the court be able to have the opportunity to, if they want to clarify or ask anything particular as to the prime entities, to have that opportunity. So I certainly don't want to rehash everything that they've said. I think we've been very careful in our briefing to make sure that we didn't do that and merely present additional unique aspects. The only things that I . . . one, I would like to try to more clarify or at least provide Judge Dennis hopefully an answer, as we see it, to the question that you asked, Mr. Mitchell, and that was regarding whether or not during that 60 days would they have had a right, would Prime have had a right to actually conduct the business. I believe that that's really the question, and that answer is no. That's tantamount to saying if I had a two-week right and was fired and they said, let's have you leave right now, whether or not, indeed, it was agreed, I go ahead and go, whether or not I have to . . . I can still actually conduct the business that was supposed to give me the income for that two weeks, the answer was no, they didn't. They didn't. The right to conduct that business left with the termination. But the real question there is, the real analysis is, this argument about the 60 days or not 60 days is a little bit of a red herring because Judge Godby's analysis correctly was more in the nature of whether or not the agreement itself, whether this type of agreement that has non-alienability or has restrictions on alienability by the non-assignability aspect as well as the termination at will aspect, whether or not those aspects make this contract able to be marketable such that it's an asset that can be subject to Tufta, okay? And his analysis was absolutely correct in that analysis of whether or not this kind of contract can be under Tufta an asset, as Justice Clement said, subject to ownership so that it can be bought or sold so that it can be transferred. That's where Judge Godby was absolutely correct in his analysis of that law and appellants haven't presented any other counter to it. I present to the court or refer to the court as in the briefing, particularly the Caro Marketing Corporation versus Play Dome case that was out of New Jersey, that was almost on all fours with this case. Same kind of contracts, terminable at will, restricted in assignability, and the New Jersey Court of Appeals reversed the lower court and said it's not an asset that's capable under the New Jersey Uniform Fraudulent Transfer Act. Well, if I wanted to confirm what you were saying, I'd look at what I look at in the record. Look at the contract that provided for 60-day notice of termination. Well, as Mr. Mitchell pointed out, that indeed it was, that although it had the 60-day terminable at will on notice of 60 days that they agreed to terminate, still did not vest the rights of them to be able to conduct the business for those 60 days. It was terminated. It was gone. They left the campus. Well, is there anything in the contract that says it's not vested or when it vests? I think it's clear. I think it's clear in the contract. But what's important here, Your Honor, is that they're making this argument on the assumption somehow. I mean, maybe I'm just probably oversimplifying, but I look at it as if, say, I'm dealing with my stockbroker and I give him 60-day carte blanche to invest my funds. Now, he's got a right there that he can use to make money. I mean, he has to perform according to what I told him to do, but he can perform those services until I terminate him properly. If you exercise that 60 days, Your Honor, here they did not exercise that 60 days. They indeed actually, this is, and I want to take the time to answer your question if I may, that they sat there and said, you fired your stockbroker right now, and you said you're done now, okay? That does not mean that he has those 60 days to continue to conduct your business. That was my point. And the entire assumption here was made upon, they make this assumption that somehow they have a judgment right to the actual income, to actually do the actual income during those 60 days, which was not a judgment right. With that, I thank you, and it's been a pleasure to appear before the Court. What's on your tie? These are Labradors, Your Honor. If I may answer your question, my children gave me this tie several years ago, and out of all the ties I own, this tie gets so many comments every day from apparently every dog-lover in the world that is like myself, and I appreciate the Court asking that. Is that a panel of dogs? It is three Labradors, yes, Your Honor. Thank you. It's been a pleasure to appear before the Court. I believe we have some time for rebuttal. Your Honors, I think that focusing on the terms of the advisory agreements is probably the most appropriate thing, and I think if we look at Section 8 of the advisory agreements, which I've already stated the record site, the base compensation that I was talking about, the percentage of assets under management, the structure of that contract is simply not the way that the defendants would like the Court to see it. It's not that I don't need to pay you anything unless and until I ask you to do something in the future, and so you don't have any rights vested. The way it's set up is that the advisor, which is our guarantor, shall be paid, I'm reading it under Section 8, shall be paid based on a percentage, and that's the base compensation, of total assets under management. The reality is that 60-day window set up two months where previous work in the past, setting up all kinds of assets that these multi-million dollar public companies had under management, that this guarantor would be entitled to a percentage of that, and that 60-day provision certainly has value to the market, has value to third parties, which is what they would like the Court to focus on, and as I mentioned, the fact that there is a provision in there that says, in the contract, in the advisory agreements, that says that the guarantor must get the consent of the public company in order to assign those contracts to a third party, that doesn't make it an anti-assignment provision. We just look at the fact that they're the same people, and we say it's an anytime assignment provision. If the guarantor wants to assign it, the guarantor may assign it, because it's the same people. He'll need to ask himself whether he can assign it. Now, here, of course, they didn't want to assign it. They wanted to cancel it. They wanted to strip this guarantor of all of its revenues, so that they could take the revenue stream, multi-millions of dollars, and move it to a new company that they invented, so that they could keep that revenue stream among themselves, among the public companies, among the new entity, and among the individuals that were keeping that cash. And was it a transfer of what was moved? How did the transferee benefit? It's pretty plain. The revenue stream was protected, was shielded, from the two-plus-million-dollar guarantee liability. We took it from the company that was subject to the guarantee, and we fraudulently transferred it to a new company that could receive the multi-million-dollar advisory income, one percentage of assets under management, other percentages of incentive income. And we don't have to worry about the two-plus-million-dollar guarantee. So we, as all the same people in this big pool of funds, we don't have to worry about your liability. And, Your Honors, under the broad and plain verbiage of the Tufts statute, which very plainly tells us that anything, and it's the word anything, which is probably as plain and broad as you can get, that may be subject of ownership, is an asset. And Your Honors, the advisory agreements are not the pest control type agreements that the defendants would like you to believe that they are. The defendants said that, you know, they tie on to Judge Godby's illusion, and I can understand him reaching this type of analysis, of what happens if a person just quits his or her job. Tufts is not set up to just say, if you quit your job and you stop earning income, that that's a fraudulent transfer. And we absolutely agree with that, Your Honors. If a company were to decide to just unilaterally shut down, that would not be a fraudulent transfer. But that's not what happened here, Your Honors. What happened is they took a multi-million-dollar revenue stream and they moved it. They moved it from a company subject to the guarantee liability to themselves in a new entity that they set up for no other purpose than to be a clean entity so that they could maintain that pool of revenue among themselves. So it's not just one person quitting his job. It's one person quitting his job, but then finding a way to still have that income from that job come to himself or come to his family, to where he or she could benefit from it. That's the fraudulent transfer aspect. It doesn't compel anyone to work. It's certainly not what it does. It's not that personal services narrative. But what it does say is if you are working, you can't quit working but still set up a keep enriching yourself at the expense of your creditors. Your Honor, that's precisely what Tufta was set up to do, is to stop that from happening. The plain and broad language, we think, puts the asset there, the very narrow portion of Tufta that Judge Godbey got to. And I only have about 45 seconds left. It was a pleasure appearing before Your Honors, and thank you very much. Thank you, sir. That concludes the oral argument cases for today. We take these cases.